Argued and submitted June 19, 1997, vacated in part and otherwise affirmed on appeal; remanded in part for further proceedings and otherwise affirmed on cross-appeal July 15, 1998

In the Matter of the Marriage of

Ethel M. SHORT,
*Respondent - Cross-Appellant,*

*and*

Walter John SHORT,
*Appellant - Cross-Respondent.*

(95-DO-0038-AB; CA A91736)

964 P2d 1033

Mark A. Johnson argued the cause for appellant - cross-respondent. With him on the briefs were Jacqueline L. Koch and Findling & Johnson LLP.

Bruce J. Brothers argued the cause for respondent - cross-appellant. With him on the brief was Brothers & Ash.

Before Deits, Chief Judge, and De Muniz and Haselton, Judges.

DEITS, C. J.

## DEITS, C. J.

Husband appeals from a judgment of dissolution. He argues that the trial court erred in setting the amount of his child support obligation and in requiring that he obtain life insurance to secure that obligation. He also asserts that the court erred in its division of the parties' property. Wife cross-appeals, contending that the trial court erred in its property division award and in not granting her request to make the child support order "retroactive" to the date that she filed a request for temporary support.

The parties were married on April 1, 1975. At the time of trial in 1995, husband was 46 and wife was 44 years old. The parties have three minor children. Shortly after the parties married, husband enrolled in a post-graduate program in international management. After graduating in 1976, husband took a job with a large banking corporation that required the family to move to South America. He left that position after about 10 years and took a job in Hong Kong with Esprit, a clothing company. In 1983, husband received a salary advance of $404,000, which he amortized for tax purposes over a five-year period. Husband's total income from all sources was $431,933 in 1988; $342,916 in 1989; $302,185 in 1990; $317,580 in 1991; $1,218,139 in 1992;[1] $644,087 in 1993; $3,002,900 in 1994; and $577,270 in 1995.

While husband was with Esprit, the parties owned and operated two companies, Surbiton and Interbond. Surbiton provided management consulting services to Esprit. Interbond was a subsidiary of Surbiton. Interbond bought the condominium in which the parties lived in Hong Kong. Wife was paid $1,500 a month by Interbond as operational manager for the condominium owners' committee, although she testified that she did not actually do anything for that company. She was the leader of the condominium owners' committee and was often called on to resolve problems at the condominiums. Otherwise, wife stayed at home to care for the children and took a variety of classes. In 1992, the parties sold the Hong Kong property and purchased, for cash, a home

---

[1] A portion of the income this year was from the sale of real property.

in Sunriver, Oregon, for $544,000. Esprit transferred husband to Germany in February 1993. Shortly after that, the parties separated.

After separating, the parties divided some of their cash accounts in order to allow each of them to purchase a new home. Both parties received about $302,000. Wife bought a house in Arizona. Husband bought a parcel of property, the "Cottonwood property," adjacent to wife's property, and gave wife the right of first refusal to buy that property. He testified that it was his understanding that wife would buy that parcel from him as soon as she acquired sufficient funds to do so. Husband also bought a home in Bend, Oregon, where he now lives, and he bought another home jointly with his parents.

Husband left Esprit on November 29, 1994. On that date, husband entered into two agreements with Esprit. The first was a termination agreement. In that agreement, Esprit gave husband about $2.5 million to terminate his employment contract with Esprit. The second agreement was a "consulting" agreement with Esprit that was actually an agreement not to compete with the company for one year (from December 1, 1994, through November 30, 1995). According to the terms of that agreement, husband was to receive about $533,000 paid in four quarterly payments beginning January 1, 1995.

The parties entered into a "Separation/Dissolution Covenant" (dissolution agreement) on December 2, 1994, that purported to deal with all issues regarding the dissolution except child support and spousal support.[2] When the parties entered into that agreement, they were both aware that husband's position with Esprit was being terminated and that he would receive the lump sum settlement under the termination agreement with the company. Those funds were allocated by the trial court in accordance with the settlement agreement. However, there was no mention of the

---

[2] It is unclear from the record whether the parties specifically asked the court to incorporate the agreement into the dissolution judgment. Although, in some respects, the judgment entered is consistent with the agreement, it is apparent that the court did not adopt the entire agreement.

funds to be received from the "consulting" agreement in the dissolution agreement. Wife testified that that was because she did not learn of husband's "consulting" agreement with Esprit until after the parties had executed their dissolution agreement. The parties also agreed that wife would draw up a list of their personal possessions, that they would both indicate which items each would prefer to keep and that, if necessary, they would negotiate "both on the basis of sentimental value as [well as] on material value on a 50/50 basis." The parties also agreed that husband was to sell the Sunriver house and the proceeds were to be divided; husband's pension and retirement funds were to be independently valued and the value divided; and all "free money accounts" were to be divided on a 50/50 basis excluding those not used for daily operational expenses of the household. It was also agreed that wife would have primary custody of the children.

Husband has not worked since leaving Esprit. He testified that he no longer wants to work in positions that would require him to live outside of the United States or that require extensive traveling because that had ruined his marriage. He said that he hopes to find a position teaching. His expert witness testified that, based on husband's qualifications, he could expect to earn between $40,000 and $70,000 in salary and up to $30,000 in bonuses working in central Oregon. The expert said that if husband were to work in Portland, he could earn up to $200,000. Neither the expert nor husband knew of any jobs available in Bend that are comparable to the job that husband held with Esprit.

During the marriage, the parties established trust accounts for each of their children. The accounts earn about $3,500 per month in interest. The trust terms state that the purpose of the trusts is to "provide funds for the health, education, support, and maintenance" of the children. The trusts also provide that "[n]o distributions shall be made which shall discharge any obligation of support which the person who is Trustee may have individually to the Beneficiary." During the marriage, the parties added the income from the trusts to the principal of the trusts.

Wife claimed expenses of about $4,400 per month for the children and another $4,000 for herself and for the maintenance of her household. Between September 1994 and September 1995, the date of the trial, husband did not pay support to the children and paid no spousal support. However, he bought the children two horses and paid $220 a month to board the horses and more than $9,000 to train them. Husband also bought the children gifts and clothes and gave them money to travel and buy presents.[3] Additionally, wife withdrew funds from the joint household account to pay for the cost of moving and maintaining her household.

The trial court ordered husband to pay a total of $3,000 per month child support for all three children. It calculated the presumed child support at $1,807, but said that that amount was rebutted based on "the children's actual needs, the desirability of [wife] remaining in the home, and the parties' standard of living while married." It further awarded each child its respective trust account and named both parties as cotrustees. The court specifically ordered that the trusts not be used to satisfy husband's support obligation. Husband also was ordered to acquire life insurance with the children and wife as beneficiaries for as long as he had a support obligation to them.

The trial court determined that husband should pay wife indefinite spousal support in the amount of $5,000 per month, which is to decrease to $2,500 on October 1, 2000. It awarded wife the home in which she and the children are living in Arizona; a Seafirst individual retirement account (IRA) valued at $178,905 and a West One Bank IRA valued at $168,190; one-half of all money on deposit in a German bank account; one-half of security deposit refunds from properties in Germany; one-half of funds in a joint First Interstate account used by the parties to pay living expenses; a judgment of $150,000 as well as a separate judgment of $19,500 to be paid when the Sunriver property was sold; a $17,000 award to be paid from the final payment under the consulting

---

[3] Husband asserts that during this time he provided $11,000 per month towards the children's and wife's support. That figure appears to be derived from the $33,000 quarterly payments he has paid to wife from the payments he received from the consultation agreement. As we will discuss later, however, that amount is properly considered property awarded to wife.

agreement; and all the personal property that she had in her possession, all bank accounts in her name alone and "all marital assets and monies previously divided by agreement by the parties."

The trial court awarded husband the Cottonwood property that is adjacent to the home awarded to wife; the property in Medford; the property in which he resides in Bend; the Sunriver property valued at $525,000; the 1993 Jeep Grand Cherokee valued at $25,000; the 1994 Dodge Viper valued at $68,000; all interest in the stock in WAIT, Inc., valued at $0; the Citibank pension account valued at $30,000; one-half of the account in Germany; one-half of the security deposits; one-half of the joint First Interstate account; a social security benefit; a $17,000 award to be paid from the final payment in the consulting agreement; all other property in his possession; and "all marital assets and monies previously divided by agreement of the parties."

The court designated the parties' tax escrow account at First Interstate as a joint account requiring both signatures to access the account and ordered that the funds in that account be held pending determination of the parties' tax obligation for 1995. The final payment of the consulting agreement was to be deposited into the account, less the $17,000 each that the court awarded to the parties. The funds in this account were to be released only to pay those taxes and to pay for tax preparation fees. After those payments are made, the remaining balance is to be divided equally between the parties.

Husband first assigns error to the trial court's calculation of his monthly child support obligation. He argues that the child support award should be eliminated or significantly reduced. Husband contends that the court made two errors in its determination of child support: First, he argues that the court should have attributed some income to wife and, consequently, that she should have been required to assume some of the burden of providing support to the children. Second, he asserts that in calculating the support award, the court should have significantly reduced its assessment of the children's needs because of the availability to

them of income from their trusts. We conclude that the trial court did not err in its calculation of child support.

The trial court calculated the child support obligation according to the child support guidelines based on a *combined* gross monthly income in excess of $9,999 and concluded that the presumptive amount of support was $1,807. It then held that the presumptive amount of support was rebutted "based on the children's actual needs, the desirability of [wife] remaining in the home, and the parties' standard of living while married." Husband does not contend that the presumptive amount of child support was not rebutted. His contention is that the trial court erred in not imputing any income to wife because she is capable of earning minimum wage and that, even if the court were to conclude that she cannot work at all, wife has investment income of $3,300 per month and spousal support of $5,000 per month.

■    It is not entirely clear from the record whether the trial court, in determining the appropriate amount of child support, did, in fact, attribute any income to wife. Regardless, on *de novo* review, we conclude that the child support award was appropriate under these circumstances. Wife presented evidence that the children's needs were $4,400 per month. Based on the record before us, we find that amount to be a reasonable estimate. After considering husband's earning capacity, which he acknowledges is $12,000 per month, as well as wife's earning capacity, we conclude that $3,000 is appropriate as husband's share of the child support obligation.

Husband also argues that the needs of the children should be reduced by the availability to the children of the income from their trusts. He argues that because the interest earned on the trusts each month is more than the $3,000 support award, the children's needs should be considered zero or, at a minimum, decreased significantly. The trial court rejected this argument relying on the specific language of the trust that "[n]o distributions shall be made which shall discharge any obligation of support which the person who is Trustee may have individually to the beneficiary." The court held that the child support obligation "shall not be affected by the award of the trust accounts to the children."

■■ We agree with the trial court's conclusion. A child's resources and income may be appropriate considerations in determining a child's needs. *Redler and Redler*, 153 Or App 135, 141, 956 P2d 232 (1998) (court need not consider income children earned from newspaper route if the court does not depart from presumptive amount of child support, but must make findings if it does depart); *Krompel and Krompel*, 129 Or App 394, 396, 879 P2d 223 (1994) (social security payments for benefit of child are financial assets or income of child that may or may not offset parent's support obligation); *Harper and Harper*, 122 Or App 9, 14, 856 P2d 334, *rev den* 318 Or 246 (1993), *cert den* 511 US 1108 (1994) (trust may be considered an asset of child in determining child support obligation). Whether such resources of a child justify a reduction of a parent's child support obligation depends on the particular circumstances. *Krompel*, 129 Or App at 396. Here, we agree with the trial court that the children's trust income should not result in a reduction of husband's child support obligation. The terms of the trust specifically provide that the trust is not to be used to allow the trustee to avoid an obligation of support. Further, the parties did not use the trust for the children's support before the dissolution. The interest income earned on the trusts has always been added to the principal of the trusts. In addition, husband has substantial income and assets with which to support the children and there is no evidence that he would be adversely affected by paying the amount of support ordered by the court. Under those circumstances, we agree with the trial court that income from the trust accounts does not justify a reduction of the child support award.

■ Husband also assigns as error the requirement that he provide life insurance to secure his child support obligation. He argues first that if we eliminate his child support obligation, as requested, there would be no obligation to secure. In light of our decision above, however, that argument is moot. Alternatively, he argues that we should reduce the amount of life insurance because there is no need to secure the child support award. Husband bases that argument on his assertion that, should he die, the children's needs can be satisfied by the income from their trust accounts. However, as discussed above, the trust accounts should not

be used to excuse husband from his support obligation. Accordingly, we agree with the trial court that husband should retain a life insurance policy to secure his child support obligation.

Husband also assigns error to the trial court's distribution of the parties' property and the amount of the equalizing judgment awarded to wife. The first specific concern that he has with the property distribution is the trial court's award to him of the Cottonwood property in Arizona. Husband argues that this property should be awarded to wife because his only reason for purchasing it was so that wife and the children could use it, and that he has no interest in keeping the property. He contends that, because he lives in Oregon, wife is better able to manage the property due to her proximity to it and that the award of the property to him keeps the parties "entangled" by making the parties' co-owners of the subdivided property. He argues that the present distribution leaves him with "vacant property in a distant state over which wife has essential dominion and control." Husband asserts that the trial court should have awarded wife the Cottonwood property, awarded the Sunriver property[4] to the parties jointly and given each party one of the IRAs.

We are required to distribute the parties' property in a manner that is "just and proper in all the circumstances." ORS 107.105(1)(f). In carrying out this objective, we attempt to disentangle the parties' finances to the greatest extent possible and to reduce or eliminate the dependence of one party on the other. *Haguewood and Haguewood*, 292 Or 197, 638 P2d 1135 (1981); *Madden and Madden*, 114 Or App 319, 323, 836 P2d 1349 (1992). It is also our objective, where possible, to award an asset to the party who is best able to manage it. *Haguewood*, 292 Or at 208.

The trial court here articulated its reasons for its distribution of the parties' property:

---

[4] At oral argument, husband asked us to take judicial notice that the Sunriver home had been sold and of the amount for which it was sold. We decline to do so. Our task is to review the decision of the lower court based on the evidence before the trial court.

"The intent behind the division of marital assets is to provide present liquidity and long term retirement security for [wife] and to disentangle the parties as much as possible. It is doubtful that [wife], even when she is employed, will be capable of accumulating monies for a secure retirement. [Husband] is awarded the Sunriver house so he can manage it as he desires. It is more reasonable for [husband], who owns a home in Bend, to deal with the rental or sale of the Sunriver house. While the division of marital assets may create short term financial issues for [husband], he has the ability to recover financially in a very short period of time."

We conclude that the property distribution formulated by the trial court is just and proper under the circumstances here. Husband's contentions as to why he should not be awarded the Cottonwood property are somewhat persuasive. However, awarding this property to wife would necessarily result in the reduction of the liquid assets available to her, which would be counter to the goal of giving her present liquidity and long-term retirement security. As the trial court recognized, although its property distribution might present short-term financial problems for husband, there is no doubt that he has the ability to recover more quickly financially. Further, if necessary, he could sell that property. Accordingly, we do not disturb the trial court's order awarding the Cottonwood property to husband. For the same reasons, we do not disturb the trial court's distribution of the Sunriver property and the IRAs.

Husband next assigns error to the trial court's award to wife of one-half of the remaining payment on the Esprit consulting agreement in addition to ordering spousal support to begin on October 1, 1995. Husband argues that the final payment from Esprit involves "future earnings" similar to retirement benefits, which should be considered as income in determining spousal support and that those funds should not also be treated as property.

Husband is correct that this presents a question somewhat analogous to the issue of whether retirement assets may be considered as both property and income. An asset that is awarded as property to one party generally

should not also be considered as income in determining spousal support for the other party. Here, the trial court characterized the lump sum payment due to husband as property. It is not clear whether the trial court also characterized husband's income from the lump sum payment as income for determining spousal support. However, on *de novo* review, even excluding the payment from Esprit, we conclude that the amount of the spousal support award was appropriate.

■ Because husband is not currently working, we base the spousal support award solely on his earning capacity. ORS 107.105(1)(d)(D); *Pagano and Pagano*, 147 Or App 357, 363, 935 P2d 1246 (1997). According to husband's expert's worst estimate, husband is readily capable of earning around $70,000 per year in Bend. Husband, in fact, concedes that his earning capacity is $12,000 per month. Husband is only temporarily prevented from taking a job with a competitor of his former employer and there are no other restrictions preventing him from returning to corporate management.[5] On the other hand, wife has a much more limited earning capacity due, in part, to the length of time that she was out of the job market. Under the circumstances here, which include that this was a long-term marriage in which, by the parties' agreement, wife stayed at home to care for the parties' children, the amount of spousal support awarded by the court is proper.

■ Husband claims in his eighth assignment of error that the trial court erred by including husband's social security benefits in the property distribution. Wife concedes that this was error. We agree. Social security benefits may not be considered in the distribution of property. *Swan and Swan*, 301 Or 167, 176, 720 P2d 747 (1986).

Husband next claims that the trial court erred in not assigning a value to the parties' personal property. As discussed above, the parties addressed the division of their personal property in the dissolution agreement. In that agreement, wife was to inventory all of their possessions, including

---

[5] Husband testified that he wanted to find work in Bend, Oregon, because he believed that the international travel involved in his job was partly responsible for the dissolution and because he wanted to spend more time with his children. However, he also testified that he was currently living in France taking a three-month course in French and that since December 1994 he has traveled once each to Singapore, Malaysia, Hong Kong, Thailand and Bali and to Mexico twice.

motor vehicles, in Germany and Sunriver. If there were areas of disagreement about the division of the property, the parties were to negotiate an agreement "both on the basis of sentimental value as [well as] on material value on a 50/50 basis." The list shows a number of items, with notations on some indicating to whom the item was to go. However, a dollar value is not listed for any of the items. Apparently, the parties were not able to reach a final resolution regarding the value to be attributed to the personal property that each requested under this agreement. The trial court concluded that, in view of the record, it was "virtually impossible" to assign a value to that personal property and simply ordered that the property should be distributed as agreed in the separation agreement, apparently assigning a like value to both parties' distributions.

██ We agree with the trial court's handling of this matter. Neither party presented an appraisal that was conducted for purposes of the dissolution proceedings. Wife testified that she thought that the actual value of the property might be about 20 percent of the appraised value based on an appraisal provided by the parties to an insurance company to insure goods that were shipped from Hong Kong to Germany. That appraisal stated that the estimated replacement value of their property was $276,555. It did not include any personal property acquired after that date and did not exclude those items that were sold before wife moved to the United States. Husband's valuation also used that appraisal and then added property acquired after the appraisal was conducted. He valued wife's portion of the property at $344,000 and his portion of the property at $34,000 for a total of $377,000. He did not present itemized evidence of the value of individual items. In view of the limited evidence in the record of the value of the parties' personal property, we agree with the trial court that it is not possible to assign meaningful values to the personal property and that the property should be divided as agreed by the parties in the separation agreement.

██ ██ Husband also assigns error to the trial court's decision to require husband, but not wife, to repay money appropriated from the parties' joint funds after they separated. He asserts that his withdrawal of funds from the joint account

was simply an effort to equalize transactions made by wife from that account for her personal purposes. Wife argues that husband unilaterally withdrew $39,000 just before trial and that the trial court properly gave her a judgment for one-half that amount. The court addressed that issue in its memorandum opinion, stating that it was awarding wife $19,500 from the joint bank account "to balance the unilateral transfer of $39,000 from the account by husband." It appears that the court made an implicit credibility determination that wife's withdrawals were for legitimate purposes related to household expenses and that husband's "equalizing" withdrawal was not. Although our review is *de novo*, because the trial court is in a better position to assess the credibility of the witnesses, we defer to the trial court's assessment of the witnesses' credibility on this issue. *See Kempke and Kempke*, 151 Or App 434, 440, 949 P2d 1239 (1997) ("We substitute our judgment for the trial court's judgment only if we have principled reasons to do so."). We affirm the equalizing judgment of $19,500 to wife. We reject husband's remaining arguments without discussion.

We next turn to wife's claims of error on cross-appeal. She asserts generally that the distribution of marital property was inequitable. She also identifies a number of specific problems. She first argues that in its disposition of the tax escrow account, the trial court erred in not dividing the funds that husband retained in that account for payment of taxes and in ordering that the final payment on the consulting fee be added to the escrow account. Wife asserts that husband has withheld more than was necessary to pay the 1995 taxes and that husband "has been transferring money in and out of that account in his sole discretion and has provided no accounting with regard to the use of those funds[.]" She contends that the preferable method of dealing with the outstanding tax issue is to give each party one-half of the balance of the tax account and to award each party one-half of the remaining Esprit payment with each party responsible for his or her own tax burden.

Husband testified that he gave wife one-half of the money that he was paid from Esprit, less the amount that he believed would be required for taxes. He explained that

because it was possible that they would be liable for additional taxes, he wanted to leave the tax account intact until all taxes were paid. The trial court left the tax escrow account intact and ordered that each party pay a portion of the final Esprit payment into that account to ensure that they would have sufficient funds to cover the worst-case tax scenario presented by husband. The court ordered that, after the 1995 taxes are paid, the remaining funds in the account are to be divided equally.

■   In view of wife's concerns and because of the substantial amount of time that has passed since the judgment was entered by the trial court, making it highly probable that the amount due for the 1995 taxes has been resolved, we remand this issue to the trial court to review the status of this account and divide any remaining proceeds appropriately

Wife also claims that the trial court erred in not awarding her one-half of the money received from deposits from properties rented in Germany during the time that they were separated. However, the judgment specifically provides that wife receive one-half of those deposits.

■   Wife also argues that the trial court should have made the child support payments retroactive to the date that she filed for temporary support pending trial. In light of the fact that wife withdrew funds from the joint bank accounts of the parties to pay for the children's support during pendency of the trial, however, we conclude that a retroactive child support award is not justified. We affirm wife's remaining assignments of error without discussion.

■   Our practice has been to determine entitlement to attorney fees at the time of our decision and indicate the determination in the tagline of our opinion. ORS 107.105(5). However, in view of the Supreme Court's decision in *McCarthy v. Oregon Freeze Dry, Inc.*, 327 Or 84, 957 P2d 1200 (1998), *on recons* 327 Or 185, 957 P2d 1207 (1998), we will no longer engage in that practice. Accordingly, our designations of "costs" will no longer indicate any determination regarding attorney fees. Requests for attorney fees must be made by petition to this court after this court's decision on the merits.

On appeal, award to wife of a portion of husband's social security benefits vacated; otherwise affirmed. On cross-appeal, distribution of tax escrow account remanded for further proceedings consistent with this opinion; otherwise affirmed. No costs to either party on appeal or on cross-appeal.