In the Matter of the Marriage of

Barbara K. BRANSCOMB,
nka Barbara K. Sullivan,
*Appellant,*

*and*

Allan B. BRANSCOMB,
*Respondent.*

15-02-21858; A122931

117 P3d 1051

George W. Kelly argued the cause and filed the briefs for appellant.

Marc D. Perrin argued the cause and filed the brief for respondent.

Before Wollheim, Presiding Judge, and Edmonds* and Schuman, Judges.

SCHUMAN, J.

---

* Edmonds, J., *vice* Richardson, S. J.

**SCHUMAN, J.**

Wife appeals from a judgment dissolving the parties' marriage. She assigns error to the trial court's distribution of marital property and debts as well as its award of spousal support. On *de novo* review, ORS 19.415(3), conditioned by the guideline that we will not modify a trial court's division of property unless we decide that "a different division is significantly preferable," *Shlitter and Shlitter,* 188 Or App 277, 283, 71 P3d 154 (2003), we conclude that, in all of those respects, the trial court erred to wife's disadvantage. We therefore modify the judgment accordingly.

## I. FACTUAL BACKGROUND

A. *The parties*

At the time wife filed for dissolution, the parties were both 56 years old. During their 14-year marriage, wife stayed at home to care for the parties' two sons, aged 12 and 24 at the time of dissolution. The older son was wife's from a previous marriage, but he had been adopted by husband, and he lived at home until shortly before the dissolution. Wife has a master's degree in creative writing and has worked sporadically as a self-employed editor, earning less than $3,000 per year. She continues to pursue her editing business and has unsuccessfully sought adjunct positions teaching English composition at the college and community college level.

During the first six years of marriage, husband suffered from chronic fatigue syndrome and was, for much of the time, unemployed. When he did work, he earned little; for a time he was a self-employed computer systems consultant, and he also started a business, which eventually failed. Both ventures generated significant debts. When his health improved, husband joined the University of Oregon as an adjunct lecturer, and he was later appointed to his present position as a full-time research assistant, earning $3,480 per month. Husband has also managed several jointly owned timber properties, discussed below, occasionally logging parts of the land for profit.

## B. *The property*

During the marriage, the parties jointly held four properties: a residence formerly owned by husband's father in Canyonville; the marital residence; and interests in two parcels of land in Elkton, which we refer to as Elkton No. 1 and Elkton No. 2. The valuation of the residences ($55,250 and $139,458, respectively) is not disputed on appeal; rather, the appeal focuses on the Elkton properties.

Husband and wife jointly owned undivided interests in these parcels and disagree sharply concerning their value. The interests derive from purchases of timberland by husband's brother Elbert, with husband's help, near Elkton, Oregon, over several years prior to the marriage. By 1975, the brothers had acquired 135 acres of property in four parcels, together known as Elkton No. 1. Thereafter, the brothers purchased an undivided 25 percent ownership interest in a second parcel from third parties, the Galases. The Galases retained the remainder of the interest in the second parcel, Elkton No. 2.

When the parties married, Elbert held title to both of the Elkton properties. During the marriage, however, he transferred half of his ownership interest in the two properties to husband and wife. As a result, the parties jointly held a 50 percent undivided interest in Elkton No. 1 and a 12 1/2 percent undivided interest in Elkton No. 2. Husband, Elbert, and the Galases executed a partnership agreement governing the management of Elkton No. 2. The agreement permits logging only upon unanimous written agreement of the partners. Each partner is required to notify the others four months in advance if he or she intends to leave the partnership. Should that occur, the remaining partners then have the option to buy out the departing party. If no buyout is offered, the partnership would be dissolved, the entire parcel would be liquidated, and each partner would receive a share of the proceeds proportional to his or her percentage of ownership. A similar agreement governs the management of Elkton No. 1, only without the Galases as owner-participants.

The strategy for managing Elkton No. 1 and Elkton No. 2 is guided by efforts to preserve oak trees, sustain biodiversity, and minimize adverse effects on wildlife. Thus, the

parcels are not managed as commercial timber farms, although logging for profit, within the framework of the partners' management strategy, has been conducted and continues to be permitted.

At trial, each party presented the testimony of a different appraiser concerning the value of the parcels, and each appraiser reached a different result and used a different methodology. Central to the dispute was whether the value of the interests should be discounted, that is, whether the appraisal should employ a minority discount to account for limitations on the control of the management of the parcels, and a marketability discount, based on decreased liquidity due in part to the joint ownership of the interests. *See Tofte and Tofte*, 134 Or App 449, 456 n 3, 895 P2d 1387 (1995) (explaining minority and marketability discounts).

Husband's appraiser, Weathers, testified that Elkton No. 1 had a total fair market value of $380,000, and Elkton No. 2 had a total fair market value of $470,000. The total values took into account land use regulations, the availability of water, the presence of a salmon-bearing stream (which could have a negative impact on logging), and limited road access. Weathers then applied a 60 percent discount to the valuation of the parties' minority shares in both parcels, reasoning that the value is decreased due to the restrictions on logging imposed by the agreements, and that common, undivided interests in timberland are less marketable. Weathers's discounted appraisal was thus based on both minority control and marketability concerns. Accordingly, Weathers assigned a net value of $94,000 to the parties' interests in both parcels.

Wife's appraiser, Booth, valued the parties' total interests in both parcels at $383,000. Booth did not apply a minority or marketability discount, although he acknowledged that common ownership can affect the value of a parcel.

In her proposed disposition, wife requested the marital residence and a portion of the parties' ownership interest in Elkton No.1, which, she hoped, could be partitioned for immediate sale. Husband asked the court to award him the

Canyonville property and both parties' interests in both parcels, so that he and his brother could continue to pursue their management goals and so that he could pass the shares on to his children.

The trial court adopted husband's appraiser's valuation, including his application of the discount, and also husband's suggested disposition of the property. Husband was awarded the interests in the Canyonville property ($55,250) and in Elkton Nos. 1 and 2, as appraised by Weathers ($94,000), together totaling $149,250. Wife was awarded the marital residence ($139,458). An equalizing judgment of $5,000 from husband to wife resulted in each party receiving an award worth approximately $144,000.

C. *The debts*

According to the testimony of her financial adviser, wife entered the marriage with over $1 million in assets, which were used in part to support the family during husband's periods of unemployment and part-time employment, and to pay debts and expenses connected with husband's businesses. By the time wife filed her petition for dissolution on October 30, 2002, wife's assets had been completely exhausted.

In the months after wife filed for dissolution but before trial in August 2003, husband and wife continued to reside in the same house. In January 2003, husband stopped giving wife money for household expenditures, some (but by no means all) of which he paid for himself. Wife used four credit card accounts, each held in her name alone, to pay for family expenses during that period and to secure cash advances for payment of her attorney fees. The total amount owed on those cards came to $29,842. Wife asserts that before husband's decision to discontinue giving money to wife, wife had incurred approximately $10,000 in credit card debt on cards in her name for family expenses, and the parties had incurred approximately $7,000 in credit card debt on their joint account for family expenses. The parties also owed payment of $1,323 for family counseling and, before the dissolution, wife also took out a federal direct parent loan for $6,653 to defray the older son's educational expenses.

The trial court equally divided the family counseling debt, but deemed wife liable for all debts on her credit cards and for the parent loan, and assigned to husband the debt on the jointly held credit card. Although the distribution, according to wife, resulted in a much greater debt burden to her, the trial court concluded, "Due to the nature of the evidence and how debts were incurred and for what, the Court considers this an equal division of the marital debts."

### D. *Spousal support*

At the time of trial, wife requested an award of transitional spousal support of $1,000 per month for five years and $750 per month for three years thereafter, to assist her while she builds her editing business, or, alternatively, establishes herself as a college-level composition teacher. Without explicit findings to explain its determination, the trial court awarded spousal support in the amount of $750 per month for three years and $500 per month for the following five years.

## II. ISSUES ON APPEAL

Wife disputes the court's division of marital property and debts. According to wife, although the court intended an equal distribution with respect to each, its valuation of the property interests provided a flawed basis for the division, and its allocation of individually held debts did not reflect the fact that credit accounts and a loan held in wife's name only were used to defray family expenses. Wife also contends that the amount of spousal support due under the trial court's order was inadequate. We address each assignment in turn.

### A. *Distribution of real property interests*

On appeal, wife contends that the trial court erred in awarding the parties' Elkton properties to husband and in adopting the Weathers appraisal for their value. According to wife, the properties are worth substantially more than the $94,000 assigned by the trial court; a more fair disposition, she maintains, would be to award a portion of the property to each party. In the alternative, she argues that if husband is awarded both parcels, we should adopt her appraiser's evaluation and reject the application of any discount. Doing so

would increase the value of property awarded to husband, for which we should compensate by increasing the equalizing judgment awarded to her. For the reasons that follow, we conclude that the parties should not continue to co-own the property, that husband's appraiser more accurately gauged the value of the property, but that a 60 percent discount to that value is inappropriate.

ORS 107.105(1)(f) requires that the division of any real or personal property that the parties hold at the time of dissolution be "just and proper in all the circumstances." In the present case, the parties do not dispute on appeal that a fair and equitable division will give each party half of the marital assets, that each parcel of real property is a marital asset, and that each party equally contributed to the acquisition of those assets. *See Kunze and Kunze*, 337 Or 122, 133, 92 P3d 100 (2004). In determining a just and proper division, then, we must begin by determining the value of the property to be divided.

As noted, the parties agreed about the value of the marital residence and the interest in the Canyonville parcel, but presented divergent appraisals of the value of their interests in Elkton Nos. 1 and 2. Without explicit findings, the trial court adopted the appraisal of husband's expert, Weathers. That value, $94,000, reflects application of a 60 percent minority and marketability discount.

■ As an initial matter, we find Weathers's methodology and reasoning more persuasive than that of wife's appraiser, Booth. By his own admission, Booth's conclusions did not account for zoning regulations and the presence of salmon-bearing streams, which are relevant to logging productivity. Booth's investigations concerning water availability were less thorough than Weathers's, and his conclusions about the usefulness of certain areas for residential construction erroneously rested in part on documentation concerning other, topographically distinct sites. For these reasons, we consider Weathers's valuation of the total value of Elkton Nos. 1 and 2 more compelling.

■ ■ The question then becomes whether application of a marketability or minority discount is appropriate. "[V]aluation is a fact-based analysis necessarily taken on a

case-by-case basis." *Tofte*, 134 Or App at 457 n 5. Often used in the context of evaluating shares in closely held corporations, a minority discount is an attempt to compensate for the risks to a prospective buyer that stem from his or her lack of control in comparison to that of other shareholders. As we explained in *Tofte*,

> "A minority discount takes into account the relationship between the interest being valued and the total enterprise. A primary factor in determining the value of a minority interest is the *degree of control* that the owner either does or does not have within the corporation. Obviously, the degree of control must be analyzed in the light of the number and size of the remaining shareholders' interests in the corporation. For instance, a 20 percent minority shareholder may have greater control relative to two 40 percent minority shareholders than he or she would have relative to an 80 percent shareholder. In the former situation, a greater degree of control might justify a smaller minority discount than would be imposed in the latter."

134 Or App at 456 n 3 (emphasis in original). Thus, when minority shares are sold on an open market, the discount adjusts for risks to the third-party buyer that accompany his or her minority status within the enterprise.

In contrast, a marketability discount offsets an interest's impaired transferability:

> "[A] marketability discount addresses the *degree of liquidity* of the interest. Such discounts compensate for the lack of a recognized market for a particular stock, lack of ready marketability, or restrictive provisions affecting ownership rights or limiting sale. A marketability discount may apply to either a minority *or* majority interest, and may be imposed in addition to a minority discount if circumstances warrant."

*Id*. (emphasis in original). In valuing corporate shares traded on public or private markets, it may be appropriate based on the facts to apply either discount or both.

But when the interest is instead part of a smaller, family-run enterprise, and when it is sold to other shareholders, the reasons for applying either discount are less likely to be present. *Webber and Webber*, 99 Or App 703, 784 P2d 111

(1989), *modified on recons*, 102 Or App 93, 792 P2d 484, *rev den*, 310 Or 282 (1990), illustrates that point. In that dissolution action, the husband was awarded the parties' minority interest in a family farm operated by the husband and the husband's father. *Id.* at 707. The husband argued that his shares should be discounted due to both minority control and decreased marketability. We held that no discount was warranted because if husband were to sell his shares, he would likely sell to his parents. *Webber*, 102 Or App at 95. Unlike third-party buyers, his parents would not incur the risks of minority ownership; compensation for such risks was therefore irrelevant to the valuation. And because the parents served as the ready market, there would be no obstacles to liquidity to justify a marketability discount. *Id.*

Similarly, in *Barlow and Barlow*, 111 Or App 179, 826 P2d 18, *rev den*, 313 Or 299 (1992), the husband was awarded the couple's interest in a closely held farm corporation, which the trial court discounted 25 percent for decreased marketability. *Id.* at 181-82. On appeal, the husband argued that his shares were subject to a greater discount based on both decreased marketability and minority control. We explained that a discount may be improper where the assumptions underlying the purpose of the discount are absent:

> "[T]he value of stock in a closely held corporation may be discounted if it represents a minority interest and if restrictive bylaw provisions, such as a right of first refusal, inhibit the stock's marketability. A discount is an attempt to take into account the difficulty of actually turning an asset into money. The underlying assumption for discounting is that, in a hypothetical sale, only part of the corporate stock will be sold, with the remainder still being held by the other shareholders. When that assumption is not supported by the evidence, a discount may not be proper."

*Id.* at 182 (citations omitted). In light of evidence that the farm would most likely be sold as a whole, rather than in individual shares, and because the husband was clearly not contemplating a sale, we concluded that the reasons for applying either type of discount were absent, and no discount was warranted. *Id.*; *see also Batt and Batt*, 149 Or App 517, 524-27, 945 P2d 517, *rev den*, 326 Or 233 (1997) (trial court

erred in applying marketability discount to value of husband's closely held farm interests where evidence indicated that most farms were sold as complete operations and husband therefore would not likely sell his shares separately, and where he would likely sell to other family shareholders and not be forced to sell at a discounted rate).

Based on the agreements governing the dissolution of the ventures and sale of interests in the Elkton parcels, we conclude that the application of a marketability or minority discount is inappropriate in this case. The relevant portions of the agreements provide:

> "Leaving the Partnership: A partner may leave the partnership by notifying the other * * * partners at least four (4) months in advance in order to give the remaining partners time to respond. The remaining partners have the option during this 4 month period to buy out the leaving partner's interest at a price for the land set by an appraiser mutually agreed upon by all partners. * * * A reply to the leaving partner, in the form of a letter stating the good faith intention of the remaining partners to sell or to make a buy-out, will be made within 30 days of notification. In the event that no buyout is offered by the remaining partners within 4 months of the notification, the partnership shall be dissolved and the assets liquidated by sale and divided proportionally to the respective percentages of ownership.

> "Dissolving the Partnership: The partners agree, in the event of dissolution, to put the property up for sale. The offering price shall be set by consultation with a real-estate agent familiar with the area and with land of this type. The best price offered in a reasonable period of time will be accepted, and the proceeds divided in proportion to ownership. The liquidation sale will be handled in a manner agreed to by all the partners. If unanimous agreement on the liquidation procedures is not reached, a majority of the partners shall select a licensed realtor to sell the assets."

Our task is to determine the value of husband's interest in the land. Ordinarily, we would determine the value of his share on the open market. Here, on the other hand, under the terms of the agreements, husband would never have to sell his share on the open market; he would either sell it to his partners or, if they do not want to buy it, the entire parcel would be sold, as a single parcel, and he would receive his

proportional share. In either case, the factual basis for a minority discount would not exist: no buyer would ever be put in the position of owning a minority interest and assuming a minority risk. If the other partners buy husband out, they simply augment their majority status; they would then become sole owners, neither majority nor minority. If no buyout occurs and the land is sold as a single parcel, then, obviously, no partial interest is put on the market.

■ Nor would the valuation require an adjustment to account for barriers to marketability. Under the agreement, the remaining partners *are* the market, and there is no reason to believe that the price they would pay, "set by an appraiser mutually agreed upon by all partners," would be anything less than full market value. In the alternative, if the other partners declined to buy out husband, the entire parcel would be marketed as a single entity. In that case, the parties would receive a portion of the full value of the parcels as determined on the open market.

For those reasons, we conclude that the most accurate appraisal of the parties' undivided interests in Elkton Nos. 1 and 2 is the amount Weathers determined, but without the discount he then applied. That amount is $248,750.[1]

■ With that valuation in mind, we turn to the "just and proper" distribution of the parties' real property in light of "all the circumstances" of this case. ORS 107.105(1)(f). We are mindful that, "[i]n a long-term marriage in which the parties' properties were acquired during the marriage, the parties should separate on as equal a basis as possible," *Stice and Stice*, 308 Or 316, 327, 779 P2d 1020 (1989), and, in accomplishing that result, courts work to "disentangle the finances in a dissolution proceeding to the greatest extent possible." *Madden and Madden*, 114 Or App 319, 323, 836 P2d 1349 (1992). When a few principal assets comprise the bulk of the marital estate, we are required to keep assets whole "[w]here division * * * would unnecessarily dissipate [their] value and where alternative means can be found for

---

[1] Weathers determined that Elkton No. 1 had a value of $380,000. The parties' 50 percent share was therefore worth $190,000. He valued Elkton No. 2 at $470,000. The parties' 12 1/2 percent share was worth $58,750. Thus, their shares of both parcels were worth $248,750.

dividing the financial benefit of the asset." *Haguewood and Haguewood*, 292 Or 197, 208, 638 P2d 1135 (1981). In such cases, "the asset should be awarded intact to the spouse best able to manage it and other forms of balancing awards of property or support should be employed." *Id.*

■ In light of those equitable considerations, we maintain the distribution of land ordered by the trial court but increase the equalizing judgment commensurate with the valuation that we have assigned. Husband is awarded the interests in the Canyonville property and in the Elkton parcels; wife is awarded the marital residence. That distribution disentangles wife from co-ownership in an ongoing enterprise with husband and Elbert, and it permits husband, who has expended significantly more effort than wife toward managing the Elkton parcels and who has greater expertise in timberland conservation and harvesting, to continue his decades-long effort to maintain the parcels in conjunction with the third-party owners.[2] However, our revised valuation necessitates an equalizing judgment of $82,271 to wife:

| Property | Husband | Wife |
|---|---|---|
| Canyonville | $ 55,250 | |
| Elkton 1 and 2 | $248,750 | |
| Marital residence | | $139,458 |
| Equalizing judgment | ($82,271) | $ 82,271 |
| TOTAL | $221,729 | $221,729 |

B. *Division of debts*

"As part of its authority to divide property, a court may divide the debts that the parties incurred during their marriage. As with assets acquired during the marriage, the debts must be divided equitably." *Shlitter*, 188 Or App at 283

---

[2] Wife contends that we should award her co-ownership in some of the parcels. According to wife, the disparity between the appraisals conveys uncertainty about the interests' true value and co-ownership would permit each party a stake in the land, whatever its worth. Although wife's proposal might result in a more precisely calibrated distribution, that advantage cannot outweigh the value of disentangling the parties' interests; co-ownership would entail significant interaction well into the future. *See Madden*, 114 Or App at 323.

(internal citations omitted). The parties agree that an equal division of the marital debt is equitable. They disagree about what debt can properly be called marital, as opposed to the debt of one of the parties. The disputed debts include amounts owed on credit cards, the amount owed to a family therapist, and the amount owed on a "parent loan" for the parties' older son. The trial court determined:

> "[Wife] is liable for the debts on her credit cards, the parent loan and half the debt to [family therapist]. [Husband] is liable for the [credit card account] in both parties['] names and half [of the family therapist] debt. Due to the nature of the evidence and how debts were incurred and for what, the Court considers this an equal division of the marital debts."

Wife maintains that the sum to be equally divided should include debts incurred on her credit cards for family expenses, including expenses from the period leading up to the dissolution when she had to use the cards to pay for family expenses because husband, although still living in the marital residence, did not pay his share. She also argues that the parties should be held equally responsible for the $6,653 "parent loan" she took out to help pay for the parties' son's college expenses.

Husband argues that the evidence does not indicate that all of wife's credit card debt is attributable to family expenses; rather, according to husband, wife used the credit cards for cash advances in order to pay attorney fees, to make purchases for wife's business, and to assist their older son, who "was well past the age of majority." Husband further argues that the parent loan was correctly assigned to wife because she took out the loan in her own name in order to support the education of the older son, whom husband suggests should be self-sufficient.[3]

---

[3] Husband also argues that the trial court's division should not be disturbed because wife, in her proposed division of assets submitted to the trial court, offered to assume responsibility for the parent loan and the debts on her credit cards. That offer, however, occurred in the context of a proposal with an entirely different division of assets than the trial court ultimately ordered, one that, for example would have permitted wife to keep parts of Elkton No. 1.

 We begin with the credit card debts. We focus not on the person in whose name the card was held, but on the use to which it was put. We do so not only, or even primarily, because we believe that the realities of contemporary marriages are such that each spouse might have separate accounts from which family, as opposed to individual, expenses are equally paid, but because, in the present case, the record contains abundant documentary evidence to that effect. Thus, instead of allocating the $7,055 debt on the jointly held credit card to husband, we allocate it equally to both parties. Likewise, the $9,193 debt on wife's Bank One credit card, incurred during the marriage, should be equally shared. *Shlitter*, 188 Or App at 283.

Further, a review of wife's debts on her other individually held credit cards indicates that the majority of the purchases that she made while caring for her younger son and while both parties continued to share the marital home were family expenses. Although the credit card statements in the record do not substantiate wife's asserted figure of $37,000, the statements of wife's accounts support her assertion that she made numerous purchases to maintain the shared household until the dissolution judgment was entered and husband moved out, and they enable us to calculate her expenditures. These expenses included such items as prescriptions, medical services, grocery items, travel, and clothing. Excluding cash advances that, according to wife's testimony, were used to defray her attorney bills for the dissolution action, and a $2,000 expenditure that wife made to purchase a business-related computer, we read the credit card statements in the record to show that wife incurred $11,272 in debt for family expenses between January 2003, when wife filed for dissolution, and August 2003, when husband left the family residence after the dissolution judgment was entered. That amount should be equally divided. The total credit card debt attributable to family expenses, then, is $27,520, and it should be equally divided.

 Next, we find that the parent loan is not a marital debt for which the parties are jointly liable. During their marriage, the parties assumed responsibility for the payment of their older son's education, which they subsidized with a jointly funded account. The son lived at home during his studies and had been supported by the parties until shortly

before the dissolution. At that point, father decided that he would no longer contribute to his son's support. Son was 24. Thereafter, wife took out the loan for $6,653. Under those circumstances, we find ample evidence in the record to support the conclusion that wife voluntarily assumed the debt on her own and with no expectation of help from husband. The parent loan should remain wife's responsibility.

Finally, we agree with the trial court that the parties should evenly divide the $1,323 debt to their family therapist. The total marital debt, to be evenly divided, is $28,843.

C. *Spousal support*

█ Lastly, we turn to the issue of spousal support. Wife asserts that the trial court erred in declining her requested award of $1,000 per month in transitional spousal support for five years, followed by $750 per month for three years. The trial court instead awarded $750 per month for three years and $500 per month for the following five years. Wife points out that her editing business is slow-growing and produces little income, never more than $3,000 annually so far, in comparison to husband's monthly salary of $3,480. Wife argues that even if her attempts to teach composition classes should succeed, her income would not increase significantly. Thus, according to wife, despite her best efforts to work in the field in which she was educated, her income will remain fairly low for the foreseeable future, and the trial court's support order does not permit her to lay the necessary groundwork for achieving a more stable and self-sufficient economic situation.

Wife further argues that much of the money she brought into the marriage was used to support husband during his periods of unemployment or underemployment, and therefore no premarital assets are left to subsidize her transition.

Husband responds that the trial court's award is within a range apparent in factually similar cases and should not be disturbed.

█ Whether a support award is "just and equitable" as required under ORS 107.105(1)(d) is an individualized determination, and therefore selective fact-matching to other, equally distinct equity evaluations is of minimal use. In our

*de novo* review, we are guided by ORS 107.105(1)(d)(A), which provides that the court may order one party to pay "[t]ransitional spousal support as needed for a party to attain education and training necessary to allow the party to prepare for reentry into the job market or for advancement therein." The parties do not dispute that wife satisfied the threshold requirement for transitional spousal support. *See Gibbons and Gibbons*, 194 Or App 257, 266, 94 P3d 879 (2004) (addressing threshold showing). Rather, the question is whether the trial court's award is "just and equitable" in light of the relevant, nonexclusive list of statutory factors:

"(i) The duration of the marriage;

"(ii) A party's training and employment skills;

"(iii) A party's work experience;

"(iv) The financial needs and resources of each party;

"(v) The tax consequences to each party;

"(vi) A party's custodial and child support responsibilities; and

"(vii) Any other factors the court deems just and equitable."

ORS 107.105(1)(d)(A)(1). After considering evidence in the record related to these factors, we agree with wife that the trial court's support order was inadequate. Concerning wife's training and employment skills, although wife holds a master's degree in creative writing, the record indicates that, over the course of her 14-year marriage, wife's nascent writing career gave way to the demands of maintaining a household, raising her sons, and assisting her husband during a six-year struggle with chronic fatigue syndrome. Although wife eventually developed her own at-home editing business, her income has been inconsistent and very modest. Although she is trying to expand the business, she acknowledges that progress will likely be slow.

Moreover, wife's work experience outside the home is limited. She testified that she taught two university classes in an adjunct capacity 13 years ago, but her recent attempts to find work as a composition teacher have not been successful, and she does not expect her prospects will

improve until she establishes herself in the higher education community. Unlike husband, wife will lose her interests in the Elkton properties, which have produced income for the family when logged. In addition, although husband is ordered to pay child support and has a 50 percent visitation arrangement, wife has legal custody of the parties' younger son, and she shares the financial burden of his counseling expenses.

As an equitable concern, we note that wife used her premarital financial assets, which included income-producing stock, to support the household during husband's periods of unemployment or underemployment due to illness and to pay off debts and otherwise subsidize husband's business ventures. Wife does not seek compensation for her support of the household during husband's career shifts, *see* ORS 107.105(1)(d)(B) (permitting court to order compensatory spousal support); the evidence is nonetheless relevant to explain her lack of financial resources during her own transition to gainful employment.

"[A] spousal support order must recognize the effects of the marriage upon the capability of [the] spouse for economic self-sufficiency." *Lemke and Lemke*, 289 Or 145, 148, 611 P2d 295 (1980). Here, the evidence indicates that the effects of the marriage have not improved wife's prospects for economic self-sufficiency, and she requires support so that she may train for advancement in her current career or develop an alternative plan. Based on our analysis of the relevant statutory factors, we hold that a "just and equitable" award of support is $1,000 per month for five years and $750 per month for three years thereafter.

Property division and debt division reversed and remanded with instructions to divide property and debt in accordance with this opinion; spousal support modified to award wife $1,000 per month for five years and $750 per month for three years thereafter; otherwise affirmed.