Argued and submitted January 17, affirmed May 16, 2012

In the Matter of the Marriage of

Dale Andrew GAY,
*Petitioner-Respondent,*
*and*

Traci Anne GAY,
*Respondent-Appellant.*

Benton County Circuit Court
0830321; A144993

279 P3d 265

Mark Johnson Roberts argued the cause and filed the briefs for appellant.

John L. Barlow argued the cause for respondent. With him on the brief was Barnhisel Willis Barlow & Stephens, PC.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

Nakamoto, J., dissenting.

### SCHUMAN, P. J.

In this appeal from a judgment dissolving the parties' marriage, wife assigns error to the trial court's distribution of property. In particular, she contends that, instead of distributing to each party its own minority shares in a closely held corporation, the court should have assigned a value to the shares, distributed all of them to husband, and imposed an equalizing judgment. We conclude that, in determining that a just and proper property division would be achieved by having the parties retain their shares, the trial court did not abuse its discretion. We therefore affirm.

Wife requests that we exercise our discretion to review the trial court's finding regarding the value of the shares *de novo*. We decline to do so because such requests are disfavored except in "exceptional" cases, and we do not find this case to meet that criterion. ORS 19.415(3); ORAP 5.40(8)(c).[1]

At the time of their divorce, the parties had been married for 14 years. Husband was 50 years old and wife was 39. The trial court awarded wife custody of the parties' 13-year-old son, with reasonable parenting time for husband. Wife has been working full time and has an imputed gross monthly income of $3,750, or approximately $45,000 per year. Husband has been employed by Middleton Heating & Sheet Metal, Inc., of Corvallis, Oregon (Middleton Heating), for over 30 years. He is now the vice-president and general manager, and his average gross monthly income is $7,911. Husband was ordered to pay child support of $627 per month and monthly spousal support of $300, to continue until the child reaches age 19.

The parties were able to agree on most of the issues relating to the division of property. The only dispute on appeal concerns the valuation and division of the parties' interest in

---

[1] ORAP 5.40(8)(c) provides:

"The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases. Consistently with that presumption against the exercise of discretion, requests under paragraph (a) or (b) of this section are disfavored."

Middleton Heating, husband's employer. Middleton Heating is a closely held corporation that has been in business since 1949. In 1973, the current owners, Judy and Glenn DeFord, purchased the business from Ms. DeFord's parents, the Middletons. Husband has worked for the company since he graduated from high school in 1977. Until 2000, the DeFords owned all of the corporation's outstanding 81 shares.

Mr. DeFord saw husband as a potential successor to the business. In 2000, the two began to discuss possible buyout strategies. They reached a tentative agreement that was reduced to writing but never signed. Mr. DeFord estimated that, as of 2000, Middleton Heating had a value of approximately $1.3 million. The plan was that husband would purchase the shares of the business over a period of approximately 20 years. For tax reasons, Mr. DeFord and husband decided that it would be best if the initial transfer of shares could be made by gift rather than sale so that the DeFords could take advantage of the annual federal gift tax exclusion of $10,000. For that purpose, the shares were estimated to have a value of approximately $10,000 each. Loosely described, the agreement called for Mr. DeFord to begin transitioning to retirement and for the DeFords to transfer by gift approximately 1.25 shares of the corporation to both husband and wife annually, for a period of approximately 10 years, or until husband and wife together owned a 51 percent interest in the corporation. At that time, Mr. DeFord would retire completely from the business, and husband would begin paying the DeFords for their remaining interest in the corporation with monthly payments of $5,000 for 10 years plus a lump sum payment at closing, at which time husband would own 100 percent of the corporation.

As noted, the agreement was never signed. However, consistent with the agreement, beginning in 2000, the DeFords began to "gift" 1.25 corporate shares per year to each party and did so until 2008 when this dissolution was filed. The transfers were approved by shareholder resolutions and noted on the corporation's ledger. By 2008, when the DeFords ceased transferring shares, the parties each owned 10 shares, or a 12.35 percent interest in the corporation.

Beyond the agreement to transfer a majority of the shares by gift, the record shows that Mr. DeFord and husband had not fully agreed to the details of the sale of the corporation. For example, it was inconclusive as to what husband would owe the DeFords for the purchase of their remaining interest in the corporation and whether the purchase would include the corporation's real property, or whether that property would be withdrawn by the DeFords and leased back to the corporation.

After the DeFords learned of this dissolution proceeding, they stopped transferring further shares to the parties. However, at trial, both Mr. DeFord and husband affirmed their intention to pursue husband's buyout of the DeFords' interest in Middleton Heating so that Mr. DeFord could retire.

The primary issue at trial concerned the valuation and division of the parties' shares of Middleton Heating. Each party's expert offered testimony concerning the value of the shares. Husband's witness, Olsen, the corporation's CPA, offered an estimate of value under what he referred to as the "net tangible asset approach." Olsen applied what he described as a "minority discount" of 35 percent to adjust for the fact that the parties owned less than 51 percent of Middleton Heating's shares. In Olsen's view, the value of each party's shares also depended in part on whether husband would acquire the real property currently owned by the corporation. Olsen estimated that if the real property was a part of the acquisition, wife's 10 shares had a value of $137,228. If the corporation was acquired without the real property, then Olsen estimated that the 10 shares were worth $61,057.

Wife's expert, Mason, was an accredited business appraiser. After considering three valuation methods and applying a marketability discount, and working under the assumption that husband would have control of the corporation within 15 months from the valuation date, Mason estimated that wife's 10 shares had a value of approximately $123,000.

Mr. DeFord and husband also each expressed an opinion of the corporation's value. In Mr. DeFord's view, the

corporation had been worth $1.3 million in 2000, and at the time of the hearing it was worth $3.9 million. Husband admitted that, at one time, he told wife that he believed that the business was worth $3 million.

The trial court concluded that the appraisals were "not overly helpful to the court" and that the valuation of the shares "calls for too much speculation for the court to have sufficient certainty to place a fair market value on the shares." In light of the lack of marketability of the parties' minority interests in the closely held corporation, the trial court stated, "there is no true market value for these shares," and it was unlikely that any value could be ascertained until husband liquidated his interest at the time of his retirement. Even that eventuality was speculative, the trial court reasoned, in light of the court's finding that the agreement for husband's acquisition of the corporation was unenforceable. In its judgment, the court repeated that "there is no true market value for" the shares. The court determined that a just and proper division of the property required that each party retain his or her shares.[2]

---

[2] In its letter opinion, the trial court said:

"The shares held by both [husband and wife] are assets acquired during the marriage and are subject to the presumption of equal contribution. [Husband] has not rebutted that presumption as to his shares. Both parties in this litigation presented evidence regarding the value of this minority interest in the corporation. * * * The Court finds that the evaluations presented by the witnesses in this case are not overly helpful to the Court in determining this matter. It is clear from the testimony that the current majority owners of [Middleton Heating] have no plans to liquidate this corporation and also have no enforceable agreement to sell the remaining shares of the corporation. Valuing the minority interest held by [husband and wife] in this case calls for too much speculation for the court to have sufficient certainty to place a fair market value on these shares. It is clear from the testimony of the witnesses in this case that there is no true fair market value for these shares. [Wife's] expert witness Mr. Mason testified that there would be no third party that would be willing to purchase [wife's] minority interest in this corporation. If this corporation was to liquidate this minority interest potentially could have a very large value. Anyone that would acquire the remaining shares of the DeFord's stock in this corporation would not need to purchase either [husband's] or [wife's] minority interest in this corporation to control the corporation. That person or entity acquiring the majority interest would not need to pay anything in the future to [husband or wife] unless the corporation was liquidated. Based on the testimony that was presented in this case the Court believes that a 'just and proper' division of the shares is simply to award to [husband] his ten shares in this corporation and to award [wife] her ten shares in the corporation."

On appeal, wife seeks to have this court place a valuation of $300,000 on her shares and, in the interest of disentangling the parties' financial affairs, require wife to transfer her shares to husband in exchange for an equalizing money judgment of $300,000, payable in equal installments over a 10-year period, with interest of nine percent.

ORS 107.105(1)(f) requires that a division of marital property be "just and proper in all the circumstances." The parties do not dispute on appeal that the Middleton Heating shares constitute marital property and a marital asset. As noted, the court determined that a just and proper division of the assets simply required that the parties retain their respective shares. Also as noted, we have declined to review this matter *de novo*; thus, we will make no new findings of fact.

We may nonetheless consider whether the trial court abused its discretion in determining what is a just and proper division of property. *Cook and Cook*, 240 Or App 1, 248 P3d 420 (2010) (whether trial court's property division was "just and proper" is reviewed for abuse of discretion). Our review for abuse of discretion means that we will not disturb the trial court's ruling if, given the facts found by the court, it chose one among a variety of legally correct outcomes. *Berg and Berg*, 250 Or App 1, 2, 279 P3d 286 (2012); *see Kunze and Kunze*, 337 Or 122, 136, 92 P3d 100 (2004); *Githens and Githens*, 227 Or App 73, 90, 204 P3d 835, *rev den*, 347 Or 42 (2009) ("In evaluating the trial court's determination about what is a just and proper distribution of marital property, we are instructed not to disturb that decision unless we conclude that the court abused its discretion and misapplied applicable statutory and equitable considerations." (citing *Kunze*)).

---

The judgment of dissolution provides:

"There is no true fair market value for the shares in Middleton Heating & Sheet Metal, Inc., owned by Husband and Wife. No third party would be willing to purchase Wife's minority interest in the corporation. Any entity seeking to acquire majority control of the corporation would not need to acquire the shares owned by the parties to do so, nor would it be required to pay anything in the future to either party unless the corporation was liquid. Based on these findings, it is just and proper to award Husband his ten (10) shares in the corporation and to award Wife her ten (10) shares in the corporation."

Thus, the issue on appeal is whether, in light of the trial court's findings that are supported by constitutionally adequate evidence in the record, the trial court's decision not to distribute wife's shares to husband in exchange for an equalizing judgment was legally permissible. We conclude that it was. It is clear that *the corporation* has value. However, both experts made clear that *wife's 10 shares* are not currently marketable separately from the corporation; thus, the evidence supports the trial court's finding that, in and of themselves, wife's shares carry no market value, discounted or otherwise, *see Branscomb and Branscomb*, 201 Or App 188, 117 P3d 1051, *rev den*, 339 Or 544 (2005), independent of the value of the corporation as a whole. In light of that finding, the trial court did not err in determining that assigning a value to the shares would be speculative.

The trial court also found that the owners of the corporation have no plans to liquidate its assets and no enforceable agreement to sell the remaining shares to husband. Those findings are also supported by the record. In light of the trial court's determination that any value assigned to wife's shares would be speculative, and the trial court's findings concerning uncertainties of husband's future acquisition of the corporation, we conclude that the trial court's determination that it is just and proper for the parties to retain their respective shares is legally permissible and that the court therefore did not abuse its discretion.

Wife cites this court's opinion in *Madden and Madden*, 114 Or App 319, 836 P2d 1349 (1992), as an example of a better outcome. In that case, we determined that, despite the speculative nature of the value of shares that the parties owned in a closely held corporation that employed the husband, it was best to divide the interest by awarding all of the shares to the husband and requiring the husband to pay the wife a money judgment. There are a multitude of reasons why *Madden* is distinguishable from this case and does not guide us here, not the least of which is that, in *Madden*, we reviewed the trial court's findings *de novo*. *Id.* at 323. More importantly, however, the fact that we approved an outcome in *Madden* that differs from the trial court's disposition of property in this case does not mean that either of the outcomes was beyond either court's discretion.

Finally, although wife is correct that it is generally preferable to create a property division that separates the parties' finances as much as possible, *see Haguewood and Haguewood*, 292 Or 197, 206-07, 638 P2d 1135 (1981), this is not a case in which the assignment of wife's shares to husband is compelled in order to avoid an entanglement of the parties' financial affairs. At the present time, neither husband nor wife derives any financial benefit from the shares or has any control over the financial affairs of the corporation by virtue of a majority ownership interest. *Cf. id.* at 207 (it was appropriate to award the husband the wife's share in closely held corporation over which the husband exercised control).

Affirmed.

**NAKAMOTO, J.,** dissenting.

Wife seeks reversal of that portion of the general judgment that awarded her 10 shares—a 12.35 percent interest—in Middleton Heating & Sheet Metal, Inc. (Middleton), a closely held corporation. She instead seeks an award of those shares to husband, who is a valued, longtime employee of Middleton; a minority shareholder aligned with Middleton's majority shareholders, Glenn and Judy DeFord; and the spouse who wants, and whom the DeFords have selected, to become the majority shareholder of Middleton. At the same time, wife seeks entry of an equalizing money judgment payable by husband to her for the value of her shares. Despite the trial court's finding that there is "no true fair market value for the shares" owned by husband and wife, the shares had financial value according to all of the witnesses who provided pertinent testimony. Because the trial court erroneously focused on the inability of wife to show that third parties were willing to buy her shares and then ruled that husband need not take the shares in the property division, wife's half of that portion of the marital property consisting of shares in Middleton likely has been rendered, practically speaking, worthless. Accordingly, I respectfully dissent from the majority's conclusion that the property division in the judgment is "just and proper in all the circumstances," ORS 107.105(1)(f).

As the majority holds, review is not *de novo*, and so, if the record contains evidence to support the trial court's

factual findings, an appellate court will not disturb them. *Ball v. Gladden,* 250 Or 485, 487, 443 P2d 621 (1968). In light of the trial court's express and implicit factual findings supported by the record, we must determine whether the trial court abused its discretion by concluding that the division of property is "just and proper in all the circumstances." *Kunze and Kunze,* 337 Or 122, 136, 92 P3d 100 (2004). In other words, the appellate court affirms unless the trial court "misapplied applicable statutory and equitable considerations" and thereby failed to choose among legally correct outcomes. *Githens and Githens,* 227 Or App 73, 90, 204 P3d 835, *rev den,* 347 Or 42 (2009).

The findings and conclusion of the trial court regarding the Middleton stock are stated in the judgment of dissolution as follows:

"8. Each party owns ten (10) shares of stock in Middleton Heating & Sheet Metal, Inc. These shares have been gifted to them over a period of eight (8) years by Judy and Glenn DeFord. There is no agreement between Husband and the DeFords regarding future gifts of shares in Middleton Heating & Sheet Metal, Inc. or Husband's purchase of said shares.

"9. All shares owned by Husband and Wife were acquired during the marriage and thus are marital assets. Husband has not rebutted the presumption that Wife contributed equally to the shares.

"10. There is no true fair market value for the shares in Middleton Heating & Sheet Metal, Inc. [o]wned by Husband and Wife. No third party would be willing to purchase Wife's minority interest in the corporation. An entity seeking to acquire majority control of the corporation would not need to acquire the shares owned by the parties to do so, nor would it be required to pay anything in the future to either party unless the corporation was liquidated. Based upon these findings, it is just and proper to award Husband his ten (10) shares in the corporation and to award Wife her ten (10) shares in the corporation."

Before entry of judgment, the trial court also provided the parties by letter with a written opinion concerning its decision. Like the judgment, the opinion emphasized the

court's decision to focus on "true fair market value" of the shares:

> "Both parties in this litigation presented evidence regarding the value of this minority interest in the corporation. [Husband's] expert witness Brent Olsen did an evaluation based on an adjusted net asset approach. The summary of this evaluation is found in Petitioner's Exhibit 7 page 2. [Wife's] expert witness William V. Mason II did his own evaluation of the minority interest in this corporation taking several different approaches. His evaluation and conclusions are set forth in [wife's] Exhibit 117. The Court finds that the evaluations presented by the witnesses in this case are not overly helpful to the Court in determining this matter. It is clear from the testimony that the current majority owners of Middleton Heating & Sheet Metal, Inc. have no plans to liquidate this corporation and also have no enforceable agreement to sell the remaining shares of the corporation. Valuing the minority interest held by [husband and wife] in this case calls for too much speculation for the Court to have sufficient certainty to place a fair market value on these shares. It is clear from the testimony of the witnesses in this case that there is no true fair market value for these shares. [Wife's] expert witness Mr. Mason testified that there would be no third party that would be willing to purchase [wife's] minority interest in this corporation. If this corporation was to liquidate this minority interest potentially could have a very large value. Anyone that would acquire the remaining shares of the DeFord's stock in this corporation would not need to purchase either [husband's] or [wife's] minority interest in this corporation to control the corporation. That person or entity acquiring the majority interest in this corporation would not need to pay anything in the future to [husband] or [wife] unless the corporation was liquidated. Based on the testimony that was presented in this case the Court believes that a 'just and proper' division of the shares is simply to award [husband] his ten shares in this corporation and to [wife] her ten shares in the corporation."

Thus, in the judgment, the trial court found that there was no enforceable agreement between the DeFords and husband for husband's acquisition of the DeFords' stock in Middleton. The court also found that neither husband nor wife could realistically put 10 shares on the market and sell them to a third party and, because the DeFords could sell

their shares to another buyer without need for the DeFords or the buyer to purchase husband's and wife's shares, the minority shares have "no true fair market value." As a result, the court determined that its decision not to transfer wife's shares in Middleton to husband was just and proper. Although its letter opinion parallels the findings and conclusion in the judgment, the trial court also stated in the opinion that "[v]aluing the minority interest held by [husband] and [wife] in this case calls for too much speculation for the Court to have sufficient certainty to place a fair market value on these shares."

To explain how I differ with the majority's conclusion, it is helpful to examine the two bases for the majority's decision that the Middleton stock property division is legally permissible. Those bases are (1) the trial court properly concluded that any value to be assigned to wife's shares would be speculative, and (2) the trial court properly found that it is uncertain whether husband will acquire the majority of shares in Middleton in the future. 250 Or App at 37.

As to the conclusion that share valuation would be speculative, the majority decides that the trial court's underlying factual finding—that "in and of themselves, wife's shares carry no market value, discounted or otherwise," that is "independent of the value of the corporation as a whole," *id.*—is supported by sufficient evidence in the record. I disagree. Instead, the evidence shows that wife's 10 shares had significant value on their own.

Each party presented expert reports and testimony as to the value of wife's shares. As noted, Mr. DeFord and husband had an unenforceable agreement for husband to acquire the DeFords' stock in Middleton over a period of time, but they both had proceeded pursuant to their agreement. As the majority notes, both Mr. DeFord and husband testified that husband would continue to acquire Middleton shares from the DeFords. Because Mr. DeFord and husband had a different understanding as to whether their agreement also included the DeFords' purchase of Middleton's real property, likely through partial redemption of the DeFords' shares in Middleton, both experts valued the shares under each understanding. Husband's expert witness, Olsen, Middleton's

CPA, provided a report valuing wife's shares using the adjusted net asset approach, one of the three commonly used valuation methodologies. Under the adjusted net asset approach, Olsen applied a 35 percent minority discount to account for the fact that wife had a 12.35 percent ownership interest in Middleton. As a result, Olsen opined that wife's shares were worth $137,228 if Middleton's assets included Middleton's real property and $61,057 without the real property.

Wife's expert, Mason, provided an extensive report in which he reviewed husband and wife's minority ownership interest under all three of the valuation methodologies: cash flow or income approach, the market approach, and the adjusted net asset approach. Mason explained that the adjusted net asset approach, the methodology that husband's expert had relied upon, focuses on the sale value of the assets of the corporation and that a "major assumption of this approach" is that the owners of the shares have "control over the assets and would be able to liquidate them at their discretion." Mason opined that the adjusted net asset approach was inappropriate for valuing the parties' shares because husband and wife have a minority interest in the corporation and the corporation has no plans to liquidate.

The market approach, Mason explained, focuses on share value assuming a sale of the corporation or all of its assets and a review of sales of comparable companies. Mason explained that under the income approach, the valuation in general terms focuses on the net income or cash that will be produced by a company's assets, reduced to present value, with an adjustment for the risk or probability of achieving the cash flow. Mason derived values of the shares owned by husband and wife under both the market and income approaches and then evaluated the extent to which a minority discount of the values should be applied to account for the parties' minority interest in Middleton and a marketability discount should be applied to account for the fact that the Middleton shares are not freely tradable. Mason gave more weight to the income approach relative to the market approach because the financial histories of the comparable companies that he was able to use in his market approach to valuation were not available. That was important in his view

because no review of company-specific risk factors that might have had a bearing on price could be undertaken. Under the income approach, Mason arrived at a value of $263,000 for all of husband's and wife's shares, or approximately $132,000 for wife's 12.35 percent interest, assuming that the DeFords purchased the real property from Middleton. Alternatively, again using the income approach, Mason valued the minority shares at $235,000, or approximately $118,000 for wife's shares only, assuming that the real property remained in Middleton's ownership.[1]

In addition to expert opinions, the unsigned written agreement in 2000 valued each share at $10,000, and the agreement included a provision that allowed the DeFords to repurchase both husband's and wife's shares for no more than $40,000. Also, Mr. DeFord and husband each testified to his opinion of Middleton's value. Mr. DeFord believed that Middleton was worth three times more than it was worth in 2000, or $3.9 million. Husband testified that he mentioned to wife that Middleton was worth $3 million. Thus, there was overwhelming evidence, presented by both parties, that wife's shares had some value. Even under the deferential standard of review of the trial court's factual findings, I have to disagree with the majority that the court's finding that wife's shares have no fair market value is supported by the evidence. That finding cannot serve as the foundation for the trial court's legal conclusion that any attempt to value wife's shares was speculative.

In addition, the trial court concluded that assigning value to wife's shares is speculative without evidence of a willing third-party buyer. That legal conclusion is belied by the expert testimony concerning share valuation, which demonstrated that minority shares in a corporation can be valued without evidence of an *actual* willing buyer of the shares. The trial court's legal conclusion also runs counter to prior decisions of this court. We have acknowledged the three approaches to determining fair value that Mason examined in his valuation of the shares. *See Columbia Management Co.*

---

[1] Mason's various market approach valuations for husband's and wife's shares were not that different from the income valuations. The market approach valuations ranged from $221,000 to $253,000.

*v. Wyss*, 94 Or App 195, 199-202, 765 P2d 207 (1988), *rev den*, 307 Or 571 (1989) (examining the three approaches and noting that all three must be considered to determine the fair price of shares held by a dissenting minority shareholder). And in *Gibbons and Gibbons*, 194 Or App 257, 263, 94 P3d 879 (2004), we affirmed the trial court's setting of the value of a minority of shares in a close corporation, stating that we were convinced "that is the price that a *hypothetical willing buyer* would likely pay for husband's stock given the combination of the minority interest and the restrictions in the stock transfer agreement." (Emphasis added.) Furthermore, the trial court wrongly assumes that a prerequisite to the ability of a court to determine the value of wife's shares is evidence of a *third-party* buyer. We have not required evidence that a third party is waiting in the wings to buy the shares of a minority shareholder as a prerequisite to valuation of those shares. *See Columbia Management Co.*, 94 Or App at 207 (where we determined the fair market value of shares held by a 14 percent minority shareholder who elected to sell his shares to the corporation as a dissenting shareholder based on appraisals, without the existence of an offer to purchase from someone outside the corporation).

"[V]aluation is a fact-based analysis necessarily taken on a case-by-case basis." *Tofte and Tofte*, 134 Or App 449, 457 n 5, 895 P2d 1387 (1995). A valuation can be and was undertaken by the parties in this case, and it accounted for the difficulty of marketing a minority ownership interest in Middleton and the risks based on the minority shareholder's lack of control. In their valuations, both wife's expert, Mason, and husband's expert, Olsen, accounted for those risks to a prospective buyer of wife's shares by determining appropriate discounts. Mason analyzed two discounts: a minority discount, to compensate for the risk to a prospective buyer from the lack of control relative to majority shareholders, and a marketability discount, to account for the increased risk to a prospective buyer from Middleton's lack of immediate liquidity. This court has previously held that, to determine the fair market value of minority shares in a corporation, minority and marketability discounts may be an appropriate way to adjust the price of shares to a prospective buyer. *See Branscomb and Branscomb*, 201 Or App 188,

196, 117 P3d 1051, *rev den*, 339 Or 544 (2005) (noting that a minority discount can "adjust[ ] for risks to the third-party buyer that accompany his or her minority status within the enterprise" and a marketability discount "offsets an interest's impaired transferability"). Thus, both the trial court and the majority have incorrectly concluded that, because wife's shares are not readily marketable to third parties, they have no fair market value and it would be pure speculation to assign a value to them.

According to the majority, the uncertainty that husband will become the majority shareholder in Middleton is the other key trial court finding that supports the conclusion that the valuation of wife's shares is speculation. The finding of uncertainty is supported by the evidence. Yet the possibility that husband will not become the majority shareholder does not render the value of the shares speculative and is not determinative of the overall propriety of the trial court's property division ruling, for several reasons.

The first reason follows from the discussion concerning share valuation. The shares of the minority shareholders have value. The two experts' valuations of the shares do not assume that husband must be a majority shareholder at the time of his purchase of wife's shares. Despite the possibility that husband for some reason will not become the majority shareholder, requiring husband to purchase the shares would not result in making husband pay for something that is worthless.

Second, although wife's minority interest may be undesirable to a prospective buyer who is not involved with Middleton now,[2] wife's shares were certainly valuable to husband while he was a minority shareholder, despite the possibility that the DeFords could change their minds about transferring their shares in Middleton to him and take back the shares they had already transferred for $40,000, before the divorce. Husband planned on using wife's shares to become

---

[2] The trial court noted that Mason stated in his testimony that there would be no third party interested in wife's minority interest. But Mason later testified, "I think that there may well be a market out there. If I didn't think there was a market I would have told you I thought the value of this hypothetical transaction was zero."

the majority owner of Middleton on a certain timetable. Post-divorce, husband still intends to gain a majority ownership interest in Middleton. He will not consider selling his own shares for fair market value, and his purchase of wife's shares will allow husband to gain a greater interest in Middleton now.

Third, despite husband's current status as a 12.35 percent shareholder and the possibility that husband may not become the majority shareholder, the parties remain financially entangled in contravention of an important equitable principle for a property division. In a variety of dissolution cases, this court has repeatedly adhered to the view that courts should seek to disentangle the parties' financial affairs. In *Branscomb and Branscomb*, 201 Or App at 199, this court recognized that,

> " '[i]n a long-term marriage in which the parties' properties were acquired during the marriage, the parties should separate on as equal basis as possible,' *Stice and Stice*, 308 Or 316, 327, 779 P2d 1020 (1989), and, in accomplishing that result, courts work to *'disentangle the finances in a dissolution proceeding to the greatest extent possible.'* *Madden and Madden*, 114 Or App 319, 323, 836 P2d 1349 (1992)."

(Emphasis added; brackets in original.) *See also Boyd and Boyd*, 226 Or App 292, 299, 203 P3d 312 (2009) (noting that courts should disentangle the parties' finances to the greatest extent possible); *Short and Short*, 155 Or App 5, 14, 964 P2d 1033 (1998) (same). Indeed, we have repeatedly reasoned that

> "in dividing the property the dissolution decree should seek to disentangle the parties' financial affairs and make them free from each other's interference. The friction resulting from the unsuccessful marriage partnership almost inevitably makes continued business association untenable."

*Slauson and Slauson*, 29 Or App 177, 183-84, 562 P2d 604 (1977). The admonition to disentangle the parties' financial interests has been repeatedly articulated by this court for over 30 years.

The majority reasons that the trial court's decision does not contravene the guiding equitable principle to create a property division that disentangles the financial interests

of the parties by concluding that husband does not have "any control over the financial affairs of the corporation by virtue of a majority ownership interest." 250 Or App at 38. The trial court did not make findings regarding husband's control over Middleton's business activities. Although it is correct that husband does not have a majority ownership interest himself, the majority appears to take for granted that husband lacks control over corporate affairs without reference to his actual control over day-to-day business and his uncontroverted alignment with the majority shareholders in the control of corporate financial decisions.

The fact is that both husband and wife are now shareholders in the same business, with only wife in the role of a minority shareholder given husband's alignment with the majority shareholders. The evidence shows that husband in fact exercises a great deal of control over the activities of the corporation given his positions as an officer, an employee-shareholder, and the DeFords' chosen successor owner of Middleton. At trial, Mr. DeFord testified that Middleton was a family-owned business and, although husband was not family, he chose husband as his successor over his daughter because they are close friends and husband was his longtime employee. According to Olsen, Mr. DeFord and husband, together, would determine the amount of cash reserves that should be retained in the corporation and the amount of bonuses they would give officers each year. The assumption that husband lacks control over financial decisions is flatly contravened by the evidence, so I cannot credit it as an implicit finding of the trial court.

Thus, husband's ownership of only 10 shares of stock does not establish that wife's interests in the corporation, with her 10 shares of stock, are actually qualitatively the same as husband's interests and that husband has no ability to act adversely to wife as a minority shareholder. And, consistent with the finding of some uncertainty, it remains quite possible that husband will become the majority shareholder. That is the continuing plan and the intention of the DeFords and husband, as both Mr. DeFord and husband testified—written agreement or not. For her part, wife can insert herself into the affairs of the corporation and assert all of her rights as a shareholder, including questioning why dividends

are not being paid to shareholders given high cash reserves in the corporation, about which Mason testified. Although husband received a significant amount in annual bonuses, he admitted that Middleton never paid dividends to its shareholders. In my view, the parties remain financially entangled because of the trial court's property division.

In addition, the trial court's decision creates economic harm to wife and fails to maximize the economic benefit of the parties' shares of Middleton stock. We have held that

> "in awarding resources to each spouse, we must consider 'the limitations of the capabilities and property of the parties.' *Haguewood and Haguewood*, 292 Or 197, 207, 638 P2d 1135 (1981). That is, we must pay attention to the entire situation and seek a solution that minimizes economic harm and *maximizes economic benefits to the parties.*"

*Howard and Howard*, 103 Or App 342, 352, 798 P2d 683 (1990) (some emphasis added). We also have said that the trial court should keep assets whole

> "[w]here division of the principal asset of the marriage would unnecessarily dissipate its value and where alternative means can be found for dividing the financial benefit of the asset, the asset should be awarded intact to the spouse best able to manage it and other forms of balancing awards of property or support should be employed."

*Haguewood and Haguewood*, 292 Or 197, 208, 638 P2d 1135 (1981).

In this case, wife is at a greater economic risk than husband if she retains ownership of her 10 shares. Given husband's position in Middleton, and his working relationship with Mr. DeFord, husband is able to affect financial decisions of the corporation by increasing the amount of salary and bonuses given to its officers. Because husband can continue, with Mr. DeFord, to exert financial control over Middleton, which has never paid dividends to its shareholders, wife, a minority shareholder, is unlikely to realize any financial benefit for her shares until Middleton is dissolved, an outcome that may never occur and that husband does not plan to seek. Furthermore, because Middleton is a closely held corporation, it is unlikely that an outsider would be

interested in purchasing her 10 shares. On the other hand, husband testified that he would not be willing to sell his shares for their fair market value. Husband acknowledged that he intends on gaining majority ownership interest in Middleton; thus, receiving wife's 12.35 percent interest in the corporation would be to his benefit because it would bring him closer to his goal of becoming the controlling shareholder.

In sum, the trial court applied an incorrect legal principle concerning valuation of the shares of Middleton and misapplied an important equitable consideration when it rendered its decision concerning the property division. Accordingly, it did not reach a permissible legal outcome, and its property division was not just and proper under all of the circumstances. Husband should be awarded all of the Middleton shares of stock, with an adjustment in the property division to account for that award. As for a disposition, although this court could make the determination of the value of wife's shares on *de novo* review, I would permit the trial court to make that determination in the first instance and to determine whether an equalizing money judgment or another adjustment of the property division is warranted to account for the award of the shares to husband. I therefore would reverse the judgment and remand for further proceedings.

Accordingly, I respectfully dissent.